**UNITED STATES of America,**

v.

**Sylvester N. BARBOUR, Appellant.**

**No. 15935.**

United States Court of Appeals
Third Circuit.

Argued Dec. 6, 1966.

Decided Feb. 16, 1967.

Sidney Ginsberg, Philadelphia, Pa., for appellant.

Harold S. O'Brian, Asst. U. S. Atty., Philadelphia, Pa. (Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before STALEY, Chief Judge, and McLAUGHLIN and FORMAN, Circuit Judges.

## OPINION OF THE COURT

McLAUGHLIN, Circuit Judge.

Appellant, a United States Post Office employee, was indicted for embezzlement of mail. (18 U.S.C. § 1709). He and his lawyer, together with the district attorney waived a jury trial and submitted the cause "for hearing and decision by the Court." After a trial appellant was found guilty. Imposition of prison sentence was suspended and he was placed on probation for one year. Because the decisional elements of this appeal are factual, including warranted conclusions from the facts, it is needful to set out the testimony in considerable detail.

It is undisputed that for some time prior to September 1965, appellant had been working for the Post Office Department as a New York mail distributor clerk on a postal railroad car between Washington and New York City. It is not controverted that prior to September 1, 1965 the Postal Inspectors' Office had received complaints concerning missing New York mail and was investigating the matter.

At the trial there was uncontradicted evidence from J. J. McNabb, Jr., a Senior Postal Inspector in charge of the Post Office inquiry, that he had prepared a test special delivery post card and two special delivery letters. In the first letter he placed $25 in currency and in the second $20 in currency. The series numbers and the serial years of the bills, etc. were noted. On September 1, 1965, Inspector McNabb turned those three communications over to H. V. Miller who was the Postal Supervisor on the particular train out of Washington that morning that, among other postal cars, carried the

New York mail car in which appellant worked. He put the particular special delivery letters and card in front of appellant's "case where he works". There were four other postal employees on the train working with the New York mail delivery and other postal employees on the train sorting other mail. Mr. Gonzales a postal employee at the Pennsylvania Railroad Station, New York City testified that he met the train when it arrived in New York. Acting under instructions from Inspector McNabb, he picked up all the special delivery pouches for New York City and brought them to the Inspector at the New York General Post Office which is adjacent to the station. The Inspector stated that he unlocked the pouches, found the post card but as to the special delivery letters he said, "I did not recover them, they were not in the pouches." Appellant, after arriving in New York City, boarded a train to go to Philadelphia where he lived. The Inspector stated that he called Postal Inspector Osgood at the Pennsylvania Station, Trenton, New Jersey and he, himself caught an 11:00 A.M. train from New York and went to Philadelphia and on to his office in the 30th Street Philadelphia Post Office. Postal Inspector Osgood testified that after he talked with Inspector McNabb he boarded the New York 8:00 A.M. Philadelphia train. He met Postal Inspectors Rutledge and Carroll who had taken the train from New York and who had appellant, also on the train, under surveillance. Inspector Osgood said that at the North Philadelphia railroad station he identified himself to appellant. He was asked "What did he [appellant] say?" He answered "I wanted him to go down to the 30th Street station with me, and he said, well, he had to go downtown anyways and he was perfectly willing to go." The witness continuing said, "At 30th Street station, Mr. Barbour accompanied me over to the Post Office" and in to Mr. McNabb's office. At the latter, Inspector Rutledge and Mr. Brown, a Post Office investigator, were present. Mr. Osgood asked as to the conversation answered:

"The conversation consisted of Mr. Rutledge informing Mr. Barbour that we were investigating the theft of certain mails and he advised him at that time that he had the right to not say anything, that if he did say anything it might be used against him in a court of law and that if he wanted an attorney he had a right to have an attorney and that if he wanted anybody else to talk to, why, he was eligible to do that, too."

The witness stated that appellant didn't express any desire to have an attorney. Inspector Osgood said, "Then I asked him to produce the contents of his pockets and he did so and in his billfold that he took from one of his pockets was the test money that was contained in the test letters." On cross-examination appears the following regarding appellant going to Inspector McNabb's office:

"A. I identified myself to Mr. Barbour at the North Philadelphia Station and I asked him if he would go with me to the post office and he said—

Q. You asked him or you told him that you wanted him?

A. I asked him if he would go to the post office with me."

The witness was queried regarding his testimony at the preliminary hearing where it was appellant's attorney who made the affirmative statement to Inspector Osgood, i. e. "Q. Therefore [stet], he was placed in custody at the 30th Street Station of the Pennsylvania Railroad?" Then appears "A. Yes." Asked about this Mr. Osgood stated, "I don't recall saying I took him into custody." Asked the same sort of question re appellant's brief case "Q. And when he arrived at the 30th Street Post Office, that brief case was searched, was it not?" The witness replied:

"A. It was opened and looked through.

A. Eventually, I don't recall it was right away. I know it wasn't right away, because we asked him where his gun was and he said, 'It is in the brief case.' And we wanted to get that gun

out of his possession. That is when we opened the brief case and went through it.

\* \* \* \* \* \*

A. We asked him where his gun was first and he said 'In the brief case.' So we opened it and took the gun out."

In answer to the Court's query whether appellant had been arrested at the 30th Street Station the witness said:

"Well, we were investigating this loss of mail, your Honor, and I wanted to talk to this man so I had him come to the office. At no time was he restrained from leaving if he wanted to leave."

Postal Inspector Rutledge compared the serial numbers on the money received from appellant with the Government record of same and found they matched. He testified he had had a talk with appellant and

"I asked him how long he had been taking mail and he said 'Two to three days.' And we asked him about special delivery letters and he said that he did not remember any specific names and addresses but that he took two special delivery letters that were addressed to New York City."

The witness asked appellant to give a written statement of what he had told the Inspectors orally "He said he would and I handed him a blank piece of paper and a pencil and asked him to write it out." Appellant took the pencil and paper and said, "I don't feel like writing. Would you write it?" The Inspector again advised appellant "that he didn't have to make any statement and that any statement he made could be used against him in a court of law; that he had a right to an attorney, to consult an attorney, or anyone else he wanted to. And I typed up the heading on the statement and the paragraph concerning the rights. Then I asked him what he wanted to say in the statement." The Inspector wrote out essentially what appellant told him. Appellant was asked to write a letter of resignation. He asked the Inspector to write this and he signed it. The Inspec-

tor told appellant he did not care whether he signed the statement or not. Appellant never refused to sign it. He wanted a little time to think it over. Appellant signed his statement prior to the preliminary hearing. Inspector McNabb was present at the time. On cross-examination he said that he too advised appellant "\* \* \* of his rights and I advised him if he wanted my advice not to sign it, at which time he did."

"The Court: In other words, he signed it, even though you advised him not to?

The Witness: Yes, sir, your Honor."

Appellant's statement admitting the offenses for which he was indicted and tried was placed in evidence.

One other phase of Inspector Rutledge's evidence should be noted. He boarded at Newark, New Jersey the train for Philadelphia on which appellant was riding. He took a seat in the same car, eight seats ahead of appellant. One of the two agents who had traveled from New York was also in that car and the other was in the passage to the car behind. There was lengthy cross-examination of the witness in this connection. The following is illuminative:

"Q. Therefore, the defendant could not have left that car, could he?

A. Without me seeing him?

Q. Without you stopping him.

A. He could have left any time. The door was open.

Q. And you would not have made any effort to restrain him?

MR. O'BRIAN: Objection, your Honor. This is speculative questioning.

THE COURT: It is cross-examination. Objection overruled.

A. At that time, no.

\* \* \* \* \* \*

Q. Inspector Rutledge, had you received any information or orders to restrain the defendant from leaving the train?

A. I had no orders to restrain him.

Q. What was the purpose of your being on that train?

A. To keep him under surveillance.

Q. And you would have merely followed him wherever he went, is that correct?

A. Do you mean if he had left the train at North Philadelphia?

Q. Yes.

A. I would have left it with him, yes, sir.

Q. And at the 30th Street Station, did you say anything to the defendant?

A. Yes, I identified myself.

Q. And what, if anything, did you say to him at that point?

A. I didn't say anything to him at that point. He was told in my presence, asked to accompany us to the inspector's office.

Q. And he was told by Inspector Osgood?

A. Yes, Inspector Osgood I believe was the one that asked him."

The testimony on behalf of the defense consisted of a postal employee who told of the work in the car where appellant was engaged. He said appellant was also taking in mail through the car end door which " * * * requires him to go to the door I'd say quite a few times, possibly ten, fifteen times during the course of a shift on that particular day. The shift started, according to the witness at 11:00 P.M. and it terminates at 7:00 A.M. approximately." There were also four character witnesses for appellant. They all answered the question regarding appellant as to "his reputation for being a decent, honest and law abiding citizen". The answer of each of them was "Excellent".

The District Judge held:

"Let the record show that in this case there are some constitutional problems involved. However, after hearing the testimony, I am convinced beyond a reasonable doubt that this man removed these two letters, took them in his possession; that there was no coercion, no unlawful arrest or custody involved, and that if I were sitting as a member of a jury, I would have no hesitancy to find him guilty beyond a rea-sonable doubt. So you are adjudged guilty."

 It is argued on behalf of appellant that the entire basis of the proofs against appellant are the result of unreasonable search and seizure. That proposition is completely destroyed by the above statement of the trial evidence upon which appellant was found guilty. That exposition, necessarily long as it is, could have been reasonably at considerably greater length. Despite a wearisome, technically meticulous trial, practically all of the evidence finally elicited solidly supports the conclusion of the trial Judge "that there was no coercion, no unlawful arrest or custody involved,". The only item that could be, and is strenuously urged in this area is that there are some possible minor inconsistencies in the trial evidence and the testimony at the preliminary hearing. The Court saw the witnesses and heard the cross-examination. Our own careful study of the entire trial transcript reveals it as soundly justifying the above quoted conclusion of the trial Court.

The record is barren of evidence of the defense assertion that "at the commencement of the interrogation Appellant refused to make any statement." The evidence is concededly from Inspector Osgood and it is as he stated, "At that time, I don't believe he [appellant] said anything, right at that time." The other portion of the Osgood record which appellant states verifies his claim, was merely that appellant refused to sign his statement when he was in the 30th Street Post Office. He did sign it after that, prior to the preliminary hearing. It is in no way controverted that from the beginning before he was asked any questions at all he was carefully told of his rights. This included the advice to him from the Post Office Executive in charge, Inspector Mc-Nabb, not to sign his statement. Appellant has never repudiated what he had told the postal authorities which was written out and later signed by him. There is not the slightest inference in the record that the statement was other than voluntary as the trial Judge held when he admitted it into evidence.

Appellant complains of the absence of a warrant for appellant's arrest and of "a search warrant for the search of the appellant's person." As we have seen, the trial Court has found on substantial evidence that there was no arrest. It also decided properly that there was no coercion. In fact there is not one word of a search of appellant's person. He was asked to empty his pockets. He acceded to this and did so. He produced his bill fold with the test currency. The brief case enters the picture solely because appellant as a Railroad Post Office employee coming off his job had an obviously loaded pistol with him. The Inspectors were anxious to obtain the weapon for paramount safety reasons. Appellant prior to that on the uncontradicted cross-examination evidence of Inspector Osgood, had emptied his pockets. The Post Office people already had the test currency. As has been above quoted it was after that the Inspectors asked appellant where his gun was and appellant told them "It is in the brief case." In the situation as Osgood said "And we wanted to get that gun out of his possession. That is when we opened the brief case and went through it." There was not only no objection from appellant but full cooperation in this. It needs no explanation why under all of the circumstances the Inspectors deemed it wise to remove the weapon themselves rather than risk a loaded gun in appellant's hands.

 Appellant also contends that he was denied a pretrial hearing on his motion to suppress evidence. The District Judge heard the motion prior to trial. He did not think at that time that calling witnesses would aid the motion. In the course of the trial the Court told defense ccunsel that if he felt he was prejudiced by not presenting testimony on his motion he could do so when the prosecution closed its case. This offer included permission for the defendant to testify as to the motion and not to be cross-examined on the merits. Defense counsel accepted that offer and the Court emphasized his anxiety not to preclude counsel from fully developing his motion. Counsel answered, "That is all I want your Honor, is the right to present it and then I will be bound by your Honor's decision." The Court, "We will hear it Monday morning at ten o'clock." The defense did nothing further regarding the motion. There was no proffer of evidence or further argument for the motion. On the whole record we find no evidence of prejudice to the defendant by reason of the handling of said motion.

In this simple factual trial there was abundant credible evidence that appellant was guilty of the offense charged. The trial Judge was entitled to and did believe that evidence. There are no true Constitutional issues in the case for consideration on this appeal.

The judgment of the District Court will be affirmed.